Opinion filed 8/11/21; subsequently modified 9/10/21 (reposted with nunc pro tunc order filed 9/23/21)

APPELLATE DIVISION OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| NORA ELMASSIAN, | ) | No. BV 033271 |
| Plaintiff and Respondent, | )<br>) | Pomona Trial Court |
| v. | )<br>) | No. 19STUD04792 |
| NOEMI FLORES, | )<br>) | |
| Defendant and Appellant. | )<br>) | **ORDER** |

Due to clerical mistake and inadvertence, the modification to this court's opinion filed on September 10, 2021, was incomplete, omitting a portion of the modification the court intended to make to page 24, footnote 19.

The portion of the order at issue stated as follows.

Page 24, footnote 19, the second sentence in the footnote that reads, "Since Oscar did not have a relationship with the son that qualifies as one listed under the domestic violence definition in Family Code section 6211, this incident did not qualify as "domestic violence" under section 1161.3, subdivision (a)."

The incomplete nature of the order is evident on its face. The omission was the result of clerical error, which can be corrected nunc pro tunc even though the opinion is now final as to this court. (See *Estate of Eckstrom* (1960) 54 Cal.2d 540, 544 ["A court can always correct a clerical, as distinguished from a judicial error which appears on the face of a decree by a nunc pro tunc order. [Citations.] It cannot, however, change an order which has become final even though made in error, if in fact the order made was that intended to be made. . . ."];

1

accord, *Golba v. Dick's Sporting Goods, Inc.* (2015) 238 Cal.App.4th 1251, 1265-1266.)

The court's September 10, 2021 modification order is hereby corrected, nunc pro tunc, to correct the portion noted above so it states,

Page 24, footnote 19, the second sentence in the footnote that reads, "Since Oscar did not have a relationship with the son that qualifies as one listed under the domestic violence definition in Family Code section 6211, this incident did not qualify as "domestic violence" under section 1161.3, subdivision (a)," is deleted, and the following text is added, "Given this court's conclusion that there was substantial evidence supporting the defense apart from this incident, the court does not decide if the incident qualified as domestic violence under section 1161.3, subdivision (a)."


_____                    _____
  Ricciardulli, J.                                        Richardson, J.



Because I filed a dissent, I take no position on whether the ordered correction to the modification order is appropriate.


                                          _____
                                            Kumar, Acting P. J.

2

Filed 8/11/21; subsequently modified (order attached)

**CERTIFIED FOR PUBLICATION**

APPELLATE DIVISION OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| NORA ELMASSIAN, | ) | No. BV 033271 |
| Plaintiff and Respondent | ) | Pomona Trial Court |
| v. | ) | No. 19STUD04792 |
| NOEMI FLORES, | ) | |
| Defendant and Appellant. | ) | **OPINION** |

APPEAL from a judgment of the Superior Court of Los Angeles County, Thomas C. Falls, Judge.  Reversed.

Taylor Campion and Jennafer Dorfman Wagner, Family Violence Appellate Project; Eric. M. Post and Danny Sandoval, BASTA, Inc.; and Craig E. Stewart, Amos J. B. Espeland, and Margaret A. Maloy, Jones Day, for Defendant and Appellant Noemi Flores.

Lane M. Nussbaum and Wayne Abb, Nussbaum APC, for Plaintiff and Respondent Nora Elmassian.

\*          \*          \*

_____

SEE DISSENTING OPINION.

INTRODUCTION

In this matter of first impression, we construe the affirmative defense in unlawful detainer evictions that "a landlord shall not terminate a tenancy . . . based upon an act or acts against a tenant . . . that constitute domestic violence" (Code of Civ. Proc., § 1161.3, subd. (a)).[1] We hold:

(1) A tenant can assert the defense to being evicted based upon domestic violence causing a nuisance on rented property even if non-domestic violence grounds are also asserted in the action. The language of the statute and its legislative history indicate that, although a tenant can be evicted for non-domestic violence grounds even when the tenant is a victim of domestic violence, including due to creating a nuisance for reasons other than domestic violence and/or failing to pay rent, in instances where the action is based on both domestic violence and non-domestic violence grounds, a tenant must be allowed to maintain the section 1161.3 defense as to the domestic violence grounds.

(2) The requisite documentation needed to support the defense can consist of a report prepared by the police narrating a domestic violence incident based solely on a tenant's statements which do not name the perpetrator of the violence, do not indicate the relationship between the victim and the perpetrator, and only document one of multiple instances of violence relied on by the landlord to evict the tenant. The statute provides the domestic violence defense must be documented by "[a] copy of a written report, written within the last 180 days, by a peace officer . . . stating that the tenant . . . has filed a report alleging that [the tenant] is a victim of domestic violence . . . ." (§ 1161.3, subd. (a)(1)(B)), and the language used and the statute's legislative history do not evince a requirement that further information be provided.

The trial court granted a directed verdict as to the defense by defendant and appellant Noemi Flores that plaintiff and respondent Nora Elmassian terminated the tenancy and brought an unlawful detainer action based upon acts of domestic violence committed in the apartment

---

[1]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

complex where defendant lived. The jury was thus not allowed to consider whether defendant should prevail on her defense as to domestic violence grounds in the action, and determined plaintiff proved defendant committed a nuisance on the property. The court entered judgment in plaintiff's favor, and defendant appealed.

We conclude the court erred in granting a directed verdict regarding the defense. There was evidence presented of defendant having committed a nuisance based upon domestic violence and non-domestic violence acts, and we cannot tell from the jury's verdict on which grounds the jury rested its decision. Viewing the evidence in the light most favorable to the party opposing the directed verdict and without considering the credibility of the witnesses, as we are required to do on appellate review, we find there was substantial evidence supporting the domestic violence defense. We thus reverse the judgment.

BACKGROUND

Complaint and Defense

Plaintiff filed the complaint on May 16, 2019,[2] alleging defendant and her husband William Flores (Will)[3] failed to comply with a three-day notice to quit their apartment unit, served on May 10. The notice provided the eviction was based on maintaining, permitting, or committing a nuisance, stating, "Lessees have engaged in repeated hostile threats towards the other tenants in the building including, but not limited to, blocking the parking access and spaces of the other tenants in the building, and damaging the vehicles of the other tenants in the building. Lessees constantly have a large number of invitees that loiter on the property who are actively using and selling narcotics on the premises. Lessees and their guests routinely harass and intimidate the other tenants in the building by threatening gang violence type retaliation if the other tenants make any complaints about them."

Defendant answered the complaint, generally denying plaintiff's allegations, and asserting several defenses. On the day trial started, during a case management conference,

---

[2]Unless otherwise specified, all further references to year are to 2019.

[3]We refer to defendant's husband and to her boyfriend by first names for ease of reference and intending no disrespect, because the witnesses, trial court and litigants refer to them in this manner.

3

the court determined defendant would be asserting the defenses that the case was brought in retaliation to defendant complaining about her unit's state of disrepair (see Civ. Code, § 1942.5), and because the action was based upon acts of domestic violence.

Testimony

Christine Singleton, who lived directly across defendant's apartment in a four-unit complex in the Boyle Heights area of Los Angeles, was the only witness called by plaintiff to prove the nuisance described in the three-day notice. Singleton testified she moved into her apartment in 2017, and defendant, along with her teenage son, two young children, and Will resided in the nearby apartment.

Each unit had a single parking spot assigned to it, and Singleton claimed that, starting in 2018, "I had problems with them parking in my property, and requesting them to move their vehicles. Blocking the driveway, making it hard to take my vehicle out and into the property." Defendant and Will would also sometimes park without permission in other tenants' spots. Both Will and defendant would park in her spot or block in her car, and she repeatedly had to ask them to move their vehicles. On one occasion, her car was vandalized, but she did not know who had caused the damage. Defendant's boyfriend, Oscar Quesada (Oscar), started coming to the location in January, one month after Will moved out, and Oscar would sometimes also park in Singleton's spot.

Singleton maintained Will had a white van, and she would often see "vagrant looking people, homeless looking people, people who look like addicts, go into the white van, and they would stay in there. . . . [T]here was weird smells coming out of the van [*sic*]. So they were doing drugs. Sometimes we would find spoons, burned spoons, in the parking structure." On five or six occasions, Singleton saw the people who had been in the van going in and out of defendant's apartment unit. One time, Singleton saw "someone drive up to the driveway, knock on the window, and exchange . . . money for a bag," leading her to suspect someone in defendant's apartment unit had sold drugs to the person. When Will left the location he took his van, but Singleton continued to see persons associated with defendant in the apartment complex area who she suspected were "drug addicts."

4

As to the threats, harassment and intimidation indicated in the eviction notice, Singleton testified both Will and defendant had many times given her "dirty looks" and she once had "an altercation" with defendant regarding the parking situation. Oscar had the tattoo "BHR" on the back of his head, and Singleton believed he was a member of the Big Hazard street gang which frequented the neighborhood. The gang was known for committing violent crimes, and Singleton was very frightened by Oscar and was reluctant to confront him when he would park in her spot.

Singleton testified on direct examination to a day where defendant and Oscar "drove their car really close to [her]" and "there were stares and dirty looks, like they were waiting to jump [her]." She explained that "what led to that incident was the night before Oscar and [defendant] were having a fight, and Oscar and [defendant] were having this fight, and it was so bad that I could hear everything, because it was in the walkway where the stairs are. Me and my mother, we were talking about it, and they didn't like us talking about it." Singleton also testified she was afraid of defendant and defendant's guests, "because they're violent people. They cause a lot of problems," and because she had seen "so many fights outside . . . with [defendant] and others fighting with other people in the driveway." Singleton additionally testified on direct that on April 26 and April 29, she sent text messages to Al Keyser, one of the managers of the property, telling him "[defendant] is back with her abuser," and complaining Oscar was parking in the driveway blocking her from parking in her spot.

On cross-examination, in addition to attempting to discredit Singleton's testimony about her parking space and car being blocked and drug activity occurring in the apartment complex, defense counsel elicited testimony to show the reason Singleton felt threatened, harassed, and intimidated was due to having witnessed multiple incidents of domestic violence involving defendant. Singleton testified things "got bad" in the months leading to the three-day notice being given to defendant on May 10. She stated she believed Oscar was a violent person, "based on the way he abuses [defendant]." Defendant and Oscar broke off their relationship, but Oscar would return to the complex. Singleton could "overhear the violence that goes on" because her door was five feet away from defendant's door. There were holes that had been

punched or kicked into the wall next to defendant's door caused by "Oscar and [defendant] when they get in a scuffle."

Defense counsel asked Singleton about text messages she sent to Keyser after April 29. The texts were sent in the five weeks following service of the three-day notice on May 10, but Singleton testified she was "really bad with dates," and as noted in the Discussion portion of the opinion, it was unclear whether incidents she narrated occurred before or after the notice was served. In a May 23 text, she told Keyser she had "video evidence" regarding Oscar, "that [defendant] was hit by her abuser. He beat her in the stairway." Singleton testified she provided the "evidence" to Keyser so it could be used "to prove that, you know, [defendant] is bringing problems to the property, a hazard to everyone who lives here." In a June 17 text, she told Keyser that during a "scuffle" between Oscar and defendant one night, she overheard "Oscar was going to take [defendant's] gun or had her gun," and heard what she thought was a gun being fired.

George Elmassian, a relative of plaintiff who helped manage the property, testified he received multiple complaints from tenants at the complex regarding people blocking other tenants' parking spots, "people [defendant] brings onto the property selling drugs on the property," and tenants "getting intimidated" and "harassed" by defendant and Oscar.[4] The three-day notice was served on defendant due to the parking issues and other reasons stated in the notice after consultation with Keyser, the person working on the case from the property management company. The first time Mr. Elmassian[5] learned about domestic violence that may have been inflicted on defendant was when Singleton told Keyser and sent him a video.

---

[4]The retaliation based on complaints due to failure to make repairs defense can be defeated if a plaintiff shows that, even if a plaintiff acted with a retaliatory motive, the plaintiff "also filed the lawsuit in good faith for a reason stated in the [eviction] notice." (CACI No. 4321; see also Civ. Code, § 1942.5, subd. (g).) Hence, testimony about the nuisance complaints which management received were admitted to show plaintiff's good faith, and were not to be considered to prove the truth of the matter that the incidents narrated actually occurred.

[5]We refer to George Elmassian as "Mr. Elmassian" to distinguish him from plaintiff Nora Elmassian.

6

Defendant never told Mr. Elmassian about domestic violence, and neither did any of the tenants in the complex.

The defense called as a witness defendant's 19-year-old son, Nathan Flores. Defendant also testified in the case.

Flores testified defendant and Will in December 2018 got into a "big argument," the police were called, and Will was required, based on a court order, to stay away from Flores's younger brothers and defendant. Flores had not seen defendant or anyone else blocking parking spots. Drugs were not sold out of their apartment, and Will did not own a white van, he owned a white truck. Oscar was in a gang, but he never used his gang affiliation to intimidate anyone. The problems with defendant and Singleton arose after defendant suspected Singleton or one of Singleton's daughters had stolen two puppies defendant had bred with her Chihuahua in order to sell. It was only after defendant confronted Singleton about the theft that all the issues between defendant and Singleton began.

Defendant testified Singleton moved into the complex in 2017. They had a cordial relationship, and Singleton's daughters would visit defendant's apartment. She lent money to Singleton to buy gasoline and food, and Singleton paid her back. Singleton allowed Will to use her parking spot. Will would sometimes perform mechanical work on vehicles owned by Singleton. Neither defendant nor Will ever blocked Singleton's parking spot. Defendant gave Singleton's mother one of the puppies she bred, and a dispute arose when two additional puppies went missing from the apartment, and defendant suspected Singleton or one of her daughters took the animals. Other than when she confronted Singleton about the puppies, defendant did not get into any arguments with her. Neither defendant nor Will ever intimidated Singleton.

Defendant testified she often complained to managers about the disrepair of her apartment, including issues with "the electricity" and the damaged and defective ceiling. Defendant also "called the city" to complain about the disrepair.

One of the managers she spoke with on the telephone was a person who identified herself as "Jovana Avalos." In December 2018, in addition to asking that her unit be repaired,

7

defendant told Jovana about an incident that led to her getting an emergency protective order followed by a restraining order regarding Will. Defendant testified Will had grabbed a knife while at the apartment, and on December 10, 2018, she obtained an emergency protective order requiring that Will stay away. Defendant wanted a security door installed due to her fear of Will. She testified, "I had been the victim of domestic violence and my social worker told me that I needed to have William be removed out of my contract. So that's when I had told her what had happened to me in December." Defendant told Avalos about the security door, and also instructed Avalos she wanted Will removed from the lease. Defendant never allowed Will to return to the apartment after obtaining the restraining order.

Oscar would not do any "gang banging" where she lived, and to her knowledge, he never intimidated or harassed anyone. But, defendant testified that, after she broke up with him in April 2019, Oscar began acting violent towards her to the point that "I would call the cops every time he'll come." On May 5, at 11:25 p.m., Oscar came by although she had told him she did not want to be with him and to "not be coming around the house." She refused to open the door, and Oscar "busted [her] wooden door open." Defendant called the police, and the police completed a report of the incident and gave her a copy.[6] Without providing details, defendant also testified there were other incidents involving physical violence towards her by Oscar in the beginning of April. Defendant further testified she told Avalos, on the telephone, what happened with Oscar in April and in May, "I told her I was having another situation and I needed the -- well, I kept proceeding with the door."

In rebuttal, Keyser testified defendant never asked him to make any repairs to the property. He was unaware of any manager named Jovana Avalos. But he noted that a three-day notice to pay rent or quit had been served on defendant in December 2018, and the person that served the notice was listed as Jovan Avalos, a field supervisor for the property management company.[7] Keyser only learned about domestic violence after the notice was

---

[6]On June 12, Oscar stole her car, and the police also gave her a report of this incident.

[7]It was undisputed that the parties resolved the issue regarding the December 2018 notice, and no action was filed against defendant based on that notice.

8

served, when he was "sent videos of a fight that occurred in front of their doorway," and when he "received several complaints at that time also in writing," that "there was fighting going on between [defendant and Oscar]."

Matthew Conrad Kaczorowski, a managing broker for the property management company employed by plaintiff, testified he was unaware of defendant requesting that repairs be performed. Jovan Avalos was a field supervisor for the company, and he was a man, not a woman, as claimed by defendant. Jovan Avalos was not supposed to have any contact with the tenants at the property other than to serve eviction notices. The motivation to evict defendant "was strictly nuisance. We were having problems. All of the tenants in the building were having problems with this tenant."

Ruling on the Defense

In considering whether to allow the jury to consider the domestic violence affirmative defense, the court indicated defendant provided a copy of the emergency protective order and restraining order. The restraining order stated a hearing was conducted on January 3, and that on that day William E. Arevalo was ordered to stay away from defendant and the apartment. The court also noted it was given copies of two reports which defendant referred to in her testimony, one dated May 5 and the other June 12.

As to the use of any domestic violence committed by Will as a defense, the court determined the emergency protective order and restraining order satisfied the documentation requirement in the statute. (§ 1161.3, subd. (a)(1).) However, the court found the defense was precluded, because Will "was a tenant of the living unit when this domestic violence occurred."[8]

Regarding the use of domestic violence by Oscar as a defense, the court found the June report documented an incident that occurred after the notice to quit was served and could not be used. The court also determined the reports provided were "notices only," and "there is

_____

[8]The statute provides the defense applies when "The person [who committed the domestic violence] . . . is not a tenant of the same dwelling unit as the tenant . . . ." (§ 1161.3, subd. (a)(2).)

9

insufficient descriptive information. These are not police reports. It is simply information for the person, the party making the report, to let them obtain a police report." The court ruled the jury could not consider domestic violence as to Oscar as a defense, because, "[O]ne, the court finds it's not sufficient to qualify as a police report. Two, there's absolutely no notice given to anyone with regard to [the May 5] incident." The court granted plaintiff's motion for a directed verdict as to the domestic violence defense.[9]

Closing Argument

Defendant's counsel in closing urged the jury to disbelieve Singleton's testimony as to her parking spot being blocked, that there was drug dealing occurring on the property, and that she was harassed and intimidated by defendant. Counsel also argued the eviction was done in retaliation for defendant complaining about her unit's disrepair. Plaintiff's attorney argued defendant was evicted based on the reasons stated in the three-day notice, not in retaliation for her complaining about her apartment needing repairs. The attorney maintained a nuisance occurred based on defendant, Will, and Oscar parking in, and blocking off, Singleton's parking spot, and due to the evidence of the use and sales of drugs by persons associated with defendant and her husband and boyfriend.

As to threats, harassment, and intimidation, plaintiff's attorney argued that, in addition to defendant being hostile and threatening Singleton and other tenants, Oscar's violent conduct towards defendant was threatening and intimidating. The attorney pointed out, "You heard directly from . . . defendant about Oscar's violent conduct at the property. It is no wonder that Ms. Singleton is terrified from this harassment and intimidation, because it is coupled with the violence that she has already seen from this person just across the hall." The attorney argued the jury should believe Singleton's claims of harassment and intimidation, because she credibly maintained "that Oscar harasses, he intimidates her. He's violent on the property on numerous

---

[9]Based on the ruling, the court denied defendant's request that the jury be given CACI No. 4328, an instruction that would have allowed the jury to render a verdict in her favor if it found the domestic violence defense was proved.

10

occasions to the defendant, as well as to others, and that this terrifies her and other tenants at the property."

Verdict and Judgment

The jury returned a special verdict, unanimously answering "Yes" to questions on a verdict form that asked, "1. Did [plaintiff] properly give [defendant] a [three-day] written notice to quit?"; "2. Did [defendant] commit or permit a nuisance on the [p]roperty?"; and "3. Did [plaintiff] file this lawsuit in good faith for a reason stated in the [three-day] notice to quit?" As instructed in the form, because it answered question 3 in the affirmative, it did not answer question 4, "Did [plaintiff] serve the [three-day] notice to quit in retaliation against [defendant] for requesting repairs to the [p]roperty?"

In accord with the verdict, the court on October 3 entered judgment in plaintiff's favor. The court awarded plaintiff possession of the property and forfeited the lease.

DISCUSSION

The propriety of a court granting a directed verdict as to a cause of action or defense is subject to de novo appellate review. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210; *Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521.) To the extent a trial court's ruling depends on construction of a statute, de novo review is also appropriate. (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1119; *Michael S. Yu, a Law Corp. v. Superior Court* (2020) 56 Cal.App.5th 636, 644.)

A directed verdict can be granted only when "the court . . . determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion . . . ." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630.)

"The rules for reviewing a directed verdict are fairly strict. '"A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom.'"' [Citation.] '"In determining whether [the evidence of the party opposing a directed verdict] is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to [the

11

party opposing a directed verdict] must be accepted as true and conflicting evidence must be disregarded. . . .'"" [Citation.]" (*O'Shea v. Lindenberg* (2021) 64 Cal.App.5th 228, 235.) "Unless it can be said that, as a matter of law, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that an appellate court would be impelled to reverse it upon appeal or a trial court set it aside, a court is not justified in taking a case from a jury and itself rendering the decision." (*Hunt v. United Bank & Trust Co.* (1930) 210 Cal. 108, 117; see also *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 ["If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied"].)

The Issues Presented

The case turns on the interpretation of the domestic violence affirmative defense statute, with regard to what it means for the termination of a tenancy to be "based upon an act or acts against a tenant . . . that constitute domestic violence" (§ 1161.3, subd. (a)), and the sufficiency of the requisite documentation provided in a police report (§ 1161.3, subd. (a)(1)(B)).

Although the court did not allow the affirmative defense to be presented as to Will, based on Will being a tenant when the violence occurred (see § 1161.3, subd. (a)(2)), we do not determine if the court erred in this regard. Because there was no evidence the domestic violence inflicted by Will (drawing a knife in December 2018 leading to defendant getting an emergency protective order followed by a restraining order) formed any part of the reasons for the eviction, defendant was not prejudiced by the error.[10] (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [when a judgment is correct, we "will affirm it regardless of the trial court's reasoning"].)

As to the court's ruling regarding the defense based on Oscar, as a threshold matter, we first analyze whether the judgment can be upheld because the three-day notice could have been

---

[10]Defendant maintained during oral argument that Singleton testified she saw Will on the property after the restraining order was issued, and his violating the order amounted to an act of domestic violence. As there was no evidence his return caused Singleton to be threatened, harassed or intimidated, even if Will violated the order, this did not constitute domestic violence supporting the defense to the nuisance-based eviction.

supported by both domestic violence and non-domestic violence evidence. (See *Cahill v. San Diego Gas & Electric Co.*, *supra*, 194 Cal.App.4th at p. 956.) We hold the judgment cannot be justified on this basis.

We proceed to conclude the court erred in granting the directed verdict due to the perceived deficiencies in defendant's documentation as to Oscar's domestic violence, and further find there was substantial evidence to support the defense.

In our analysis, we do not decide if the court erred in granting the verdict on the defense based on defendant failing to provide plaintiff notice of domestic violence as to Oscar. Even if the court was correct in finding such notice was required, lack of notice was not a reason to bar the defense. Defendant testified she called Jovana Avalos, a person defendant believed was a manager, and she told Avalos prior to being served with the eviction notice what happened with Oscar in April and in May. Defendant's testimony was buttressed by evidence there was a Jovan Avalos who was a field supervisor for the property management company. Plaintiff presented proof that there was no person named Jovana Avalos and that the call was not made. However, we cannot affirm the ruling granting a directed verdict on grounds of notice under the facts presented, as an appellate court is not allowed to weigh the evidence or consider the credibility of witnesses, and instead must accept the evidence most favorable to a party opposing the granting of a directed verdict. (*O'Shea v. Lindenberg*, *supra*, 64 Cal.App.5th at p. 235.)

Standards of Construction and the Statute

Our role "'"is to determine the Legislature's intent so as to effectuate the law's purpose." [Citation.] We begin by examining the statutory language because the words of a statute are generally the most reliable indicator of legislative intent. [Citations.] We give the words of the statute their ordinary and usual meaning and view them in their statutory context. [Citation.] We harmonize the various parts of the enactment by considering them in the context of the statutory framework as a whole.' [Citations.]" (*1550 Laurel Owner's Assn., Inc. v. Appellate Division of Superior Court* (2018) 28 Cal.App.5th 1146, 1151.)

"If the statutory language is not clear, a court may resort to extrinsic sources, like legislative history." (*926 North Ardmore Avenue, LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 328.) But "'"[i]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to [extrinsic] indicia of the intent of the Legislature . . . ."'" (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 419; see also *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1562 [other indicia of intent, such as legislative history, may be consulted when a statute is susceptible of more than one interpretation, but not "[w]hen the language is clear and unambiguous"]; accord, *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 ["'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs'"].)

Section 1161.3, provides in relevant part, as follows.

(a) Except as provided in subdivision (b), a landlord shall not terminate a tenancy or fail to renew a tenancy based upon an act or acts against a tenant or a tenant's household member that constitute domestic violence as defined in Section 6211 of the Family Code,[11] sexual assault as defined in Section 1219, stalking as defined in Section 1708.7 of the Civil Code or Section 646.9 of the Penal Code, human trafficking as defined in Section 236.1 of the Penal Code, or abuse of an elder or a dependent adult as defined in Section 15610.07 of the Welfare and Institutions Code, if both of the following apply:

(1) The act or acts of domestic violence, sexual assault, stalking, human trafficking, or abuse of an elder or a dependent adult have been documented by one of the following:

---

[11]Family Code section 6211 provides, "'Domestic violence' is abuse perpetrated against any of the following persons," and proceeds to list relationships that include, "(a) A spouse or former spouse. [¶] (b) A cohabitant or former cohabitant . . . . [¶] [and] (c) A person with whom the respondent is having or has had a dating or engagement relationship . . . ." Under subdivision (a) of section 6203, "'abuse' means any of the following: [¶] (1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [Family Code] section 6320." In turn, section 6320, subdivision (a), of the Family Code provides, in part, "[t]he court may issue an ex parte order enjoining a party from . . . stalking, threatening, . . . harassing, . . . destroying personal property, . . . or disturbing the peace of the other party . . . ."

(A) A temporary restraining order, emergency protective order, or protective order lawfully issued within the last 180 days pursuant to Section 527.6, Part 3 (commencing with Section 6240), Part 4 (commencing with Section 6300), or Part 5 (commencing with Section 6400) of Division 10 of the Family Code, Section 136.2 of the Penal Code, or Section 213.5 or 15657.03 of the Welfare and Institutions Code that protects the tenant or household member from domestic violence, sexual assault, stalking, human trafficking, or abuse of an elder or a dependent adult.

(B) A copy of a written report, written within the last 180 days, by a peace officer employed by a state or local law enforcement agency acting in his or her official capacity, stating that the tenant or household member has filed a report alleging that he or she or the household member is a victim of domestic violence, sexual assault, stalking, human trafficking, or abuse of an elder or a dependent adult.

(C) Documentation from a qualified third[-]party based on information received by that third[-]party while acting in his or her professional capacity to indicate that the tenant or household member is seeking assistance for physical or mental injuries or abuse resulting from an act of domestic violence, sexual assault, stalking, human trafficking, elder abuse, or dependent adult abuse.

(D) . . . .[12]

(2) The person against whom the protection order has been issued or who was named in the police report or Tenant Statement and Qualified Third[-]Party Statement regarding the act or acts of domestic violence, sexual assault, stalking, human trafficking, or abuse of an elder or dependent adult is not a tenant of the same dwelling unit as the tenant or household member.[13]

---

[12]Section 1161.3, subdivision (a)(1)(D), states, "The documentation shall contain, in substantially the same form, the following," and sets forth the language to be used in the tenant and qualified third-party statements specified in section 1161.3, subdivision (a)(1)(C).

[13]Subdivision (b), of section 1161.3 provides, "A landlord may terminate or decline to renew a tenancy after the tenant has availed himself or herself of the protections afforded by subdivision (a) if both of the following apply: [¶] (1) Either of the following: [¶] (A) The tenant allows the person against whom the protection order has been issued or who was named in the police report or Tenant Statement and Qualified Third[-]Party Statement regarding the act or acts of domestic violence, sexual assault, stalking, human trafficking, or abuse of an elder or a dependent adult to visit the property. [¶] (B) The landlord reasonably believes that the presence of the person against whom the protection order has been issued or who was named in the police report or Tenant Statement and Qualified Third[-]Party Statement regarding the act or acts of domestic violence, sexual assault, stalking, human trafficking, or

The "Based Upon" Requirement

The statute states, ". . . . a landlord shall not terminate a tenancy or fail to renew a tenancy *based upon* an act or acts against a tenant . . . that constitute domestic violence . . . ." (§ 1161.3, subd. (a).)  The word "based" means "having as its basis," and a "basis," is defined as "the base, foundation, or chief supporting factor of anything . . . [⁋] . . . the principal constituent of anything."  (Collins English Dict. (online ed. 2021) <https: //www.collinsdictionary.com/us/dictionary/english/based; basis> [as of July 20, 2021]; see *Consumer Advocacy Group, Inc. v. Exxon Mobil Corp.* (2002) 104 Cal.App.4th 438, 444 [to ascertain the common meaning of a word in a statute, "a court typically looks to dictionaries"].) The word "upon" in the phrase refers to the object on which something is based.  (Merriam-Webster's Online Dict. (2021) <http://www. merriam-webster.com/dictionary/upon> [as of July 20, 2021].)  In context, the words of the statute specify that a landlord cannot terminate a tenancy when the termination rests or is supported by an act or acts of domestic violence.  In contrast with the retaliation eviction defense, there is no requirement that a lessor have retaliated against a tenant by proceeding with an eviction based on the existence of domestic violence (Civ. Code § 1942.5, subd. (a)), and no provision specifying a lessor may prevail even if acting in retaliation "if the notice of termination [of a tenancy] . . . states the ground upon which the lessor, in good faith, seeks to recover possession . . . ." (Civ. Code § 1942.5, subd. (g)).

A landlord may terminate a tenancy, and subsequently seek to regain possession of property, by maintaining an unlawful detainer action based on grounds that include a tenant defaulting in paying rent when a three-day notice specifying the amount owed is provided and the person continues in possession without paying after the period expires (§ 1161, subd. (2)); when a tenant fails to comply with a covenant of a lease and continues in possession after

---

abuse of an elder or dependent adult poses a physical threat to other tenants, guests, invitees, or licensees, or to a tenant's right to quiet possession pursuant to Section 1927 of the Civil Code.  [⁋] (2) The landlord previously gave at least three days' notice to the tenant to correct a violation of paragraph (1)."

16

expiration of a three-day notice specifying the covenant that must be performed (§ 1161, subd. (3)); and "maintaining, committing, or permitting the commission of a nuisance upon [rental property]" and failing to vacate the property once a three-day notice expires (§ 1161, subd. (4)).

A nuisance as defined by Civil Code section 3479 as, "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, . . . offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ." A nuisance may therefore be based on an act or acts of domestic violence, to the extent the activity is "injurious to [the] health" of other tenants, is "offensive to the senses" of the tenants, and/or threatens the other tenants and interferes with their comfortable enjoyment of their apartments.[14]

Pursuant to the text of section 1161.3, a termination of a tenancy, followed by an unlawful detainer action, which is based upon grounds such as failing to pay rent, or disobeying a covenant like a no-pets clause, is not one which rests or is supported by domestic violence. Likewise, a termination/unlawful detainer based on a tenant committing a nuisance, by selling drugs or interfering with other tenants' property interests, like using their parking spots without permission, also neither rests nor is supported by domestic violence. In contrast, a termination/unlawful detainer based on a nuisance where an act or acts of domestic violence are injurious to other tenants' health, disturb the other tenants, and/or interfere with their property, *does* rest, and *is* supported by, domestic violence evidence.

We thus agree with plaintiff's argument on appeal, that existence of domestic violence is not a talisman which may be invoked to thwart an eviction regardless of the presence of valid grounds for an unlawful detainer. On the other hand, we find that, when a landlord uses

---

[14]In an area governed by the City of Los Angeles rent control statute, as where the property in the present case was located, a nuisance also includes "any gang-related crime, violent crime, . . . threat of violent crime, illegal drug activity, [and] any documented activity commonly associated with illegal drug dealing . . . ." (L.A. Mun. Code, § 151.09, subd. (A)(3).)

domestic violence acts to prove a ground for an action, the affirmative defense applies as to that ground.[15]

To the extent there is any ambiguity in the law as to when the defense can be used, the legislative history of the bill that first enacted the statute fully supports our interpretation of what it means for the termination of a tenancy to be "based upon" domestic violence acts. Reports before the Legislature in 2010—when the bill enacting the statute that provided, as it does now, a termination must be "based upon" domestic violence, was being considered—indicate as follows.

"[S]ome landlord groups worried that tenants might abuse this right by claiming to be victims in order to avoid eviction on other grounds. However, the bill makes it quite clear that the landlord is only restricted from terminating a tenancy if the termination is 'based upon an act or acts against a tenant that constitute domestic violence . . . .' " In other words, if a tenant fails to pay rent or violates some other condition of the lease, the protection provided by this bill will not apply even if the tenant has documentation showing that he or she is a victim of domestic violence. It is *only* when the landlord terminates the tenancy *because of* problems created by the acts of the abuser—such as loud noises that disturb other tenants, violence that may threaten other tenants, or frequent police calls to quell disturbances—that the victim may invoke the provisions of this bill." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 782 (2009-2010 Reg. Sess.) as amended June 10, 2010, p. 5, italics in original; see Assem. Floor, Analysis of Sen. Bill No. 782 (2009-2010 Reg. Sess.) as amended Aug. 2, 2010, p. 3 [same].)

---

[15]We note the pattern jury instruction as to the defense, CACI No. 4328, states, in part, "[Name of defendant] claims that [name of plaintiff] is not entitled to evict [him/her/nonbinary pronoun] because [name of plaintiff] *filed this lawsuit* based on [an] act[s] of [domestic violence . . . .]" (italics added). This statement could be, erroneously, taken as informing a jury that the defense applies only when *an eviction action* was filed due to domestic violence, even if the action was based on both domestic violence and non-domestic violence grounds. (See *PGA West Residential Assn., Inc. v. Hulven Internat., Inc.* (2017) 14 Cal.App.5th 156, 179, fn. 17 [Jury instructions "'are not themselves the law, and are not authority to establish legal propositions'"]; *Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1049 [same].)

The intent was to preclude using the defense when the eviction was based on reasons other than domestic violence, and to allow a tenant-victim to defend against grounds for actions which relied on domestic violence acts to prove an unlawful detainer.

Required Documentation

For a tenant to be allowed to use the domestic violence defense, the statute requires that acts of domestic violence "have been documented."  (§ 1161.3, subd. (a)(1).)  In addition to stating acts can be documented by a restraining or protective order (§ 1161.3, subd. (a)(1)(A)), and by "[d]ocumentation from a qualified third party based on information received by that third party while acting in [the party's] professional capacity" (§ 1161.3, subd. (a)(1)(C)), a tenant can provide, "[a] copy of a written report, written within the last 180 days, by a peace officer employed by a state or local law enforcement agency acting in his or her official capacity, stating that the tenant . . . has filed a report alleging that he or she . . . is a victim of domestic violence . . . ."  (§ 1161.3, subd. (a)(1)(B)).

We quickly dispense with the trial court's reason to bar the domestic violence defense due to Oscar's acts because the May 5 and June 12 documents were "notices only" and "not police reports."  The court appeared to distinguish between a report by a law enforcement officer that memorializes the officer's efforts in interviewing witnesses and investigating the case, and when a report only narrates reporting parties "making the report, to let them obtain a police report."  The May 5 document (as did the June 12 one which fell outside the pertinent period and thus could not be used to support the defense) consisted of a single page stating, at the top, "Los Angeles Police Department INVESTIGATIVE REPORT" (capitalization in original), and documented a police officer going to the apartment complex and taking a report based on what defendant said and then both the officer and defendant signing the report. Contrary to the court's conclusion, the plain words of the statute only require "a written report" by a peace officer, and both an initial report based on a victim's statements and a report narrating further investigative efforts fit this requirement.

As to the court's reason for precluding the defense, that "there is insufficient descriptive information" in the report, it is true that neither Oscar nor any other perpetrator is named, and

that the perpetrator is not described as a boyfriend, husband, cohabitant, or as fitting any of the other relations listed in the domestic violence statute (Fam. Code, § 6211). In addition, the report only related one incident that happened on May 5, yet defendant's position was that plaintiff relied on multiple domestic violence acts that happened in April and May 2019 in attempting to prove defendant committed a nuisance.

The May 5 report states, "Susp used one of his feet to kick the victim's door, as a result the bottom portion of the door broke [*sic*]"; the report indicates the crime occurred on "5/5/19 2300 HRS" at the apartment complex where defendant lived; and the officer who took the report and signed his name checked a box stating "DOMESTIC VIOLENCE" (capitalization in original).

The report thus fulfilled all statutory requirements: (1) It was in writing; (2) executed within 180 days from when plaintiff sought to terminate defendant's tenancy; (3) written by an officer in the officer's official capacity; and (4) the tenant filed the report alleging she was a victim of domestic violence. Requiring that the perpetrator be named and that his relationship to the victim be described would run counter to the fundamental tenet of statutory interpretation that "courts should not add provisions to a statute." (*Lee v. Kotyluk* (2021) 59 Cal.App.5th 719, 726; see *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998 ["This rule has been codified in California as section 1858, which provides that a court must not 'insert what has been omitted' from a statute"].) In addition, the Legislature included an identity component in section 1161.3, subdivision (a)(1)(D), regarding third-party statements.[16] Thus, we infer the Legislature was aware of a potential identity component but deliberately chose to exclude it from police reports. (See e.g., *American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 465; *Prang v. Amen* (2020) 58 Cal.App.5th 246, 257- 258.) Likewise, as the documentation needed is only that a tenant "filed the report alleging she

---

[16]The form in the statute, used for the tenant statement that must be given to a third party, includes a space for the victim to fill out stating, "The incident(s) was/were committed by the following person(s), with these physical description(s), if known and safe to provide:" (§ 1161.3, subd. (a)(1)(D).)

was a victim of domestic violence," further necessitating the filing of a report or documentation as to each instance of violence relied on by a landlord would add a requirement not listed in the statute.[17]

Any ambiguity is resolved by examining the statute's legislative history. The most recent amendment to the statute added the qualified third-party statement concerning the abuse as a documentation option (§ 1161.3, subd. (a)(1)(C); see Stats. 2018, ch. 190). The Legislature considered that the documentation requirement was included as a prerequisite to using the defense as a way, "[t]o prevent unscrupulous tenants from merely pretending to be crime victims." (Sen. Judiciary Com., Analysis of Assem. Bill No. 2413 (2017-2018 Reg. Sess.) as amended June 11, 2018, p. 7.) It was noted that, pursuant to the requirements of section 1161.3, "the tenant must have a temporary restraining order, protective order, or police report. In other words, the tenant must interact with law enforcement," and the third-party statement was added as an option because "tenants may have legitimate reasons for avoiding contact with law enforcement." (*Id.* at p. 8.)

The intent of requiring documentation was to forestall "unscrupulous tenants" from making up domestic violence to defend evictions, and to make it easier for victims to be on record as having been victimized. Requiring a victim to secure a detailed report naming the perpetrator and his relationship to her would be inimical to the Legislature's goals. Moreover, since the intent was simply to have the tenant be on record as being a victim, requiring documentation of multiple instances of violence would add burdens on victims not contemplated by the statute.

Substantial Evidence Supporting the Defense

Plaintiff's unlawful detainer action was based on defendant having maintained, permitted, and/or committed a nuisance. (§ 1161, subd. (4).) As noted in the three-day notice

---

[17]At one point, the court alluded to the fact the report was insufficient because "it's a vandalism charge." Yet, "destroying personal property" of a victim by a perpetrator listed in the Family Code qualifies as domestic violence (Fam. Code, §§ 603, subd. (a)(4), 6320, subd. (a)), and we can readily infer defendant was alleging a listed person committed the crime because the officer checked the "DOMESTIC VIOLENCE" box in the report.

21

and further developed at trial, there were three sets of facts relied on to prove the nuisance: (1) using without authorization and blocking the parking spots designated to next door neighbor Singleton and other tenants; (2) having persons who Singleton described as "vagrant looking people, homeless looking people, people who look like drug addicts" come onto the property and engage in drug sales and drug-related activity; and (3) threats, harassment, and intimidation by defendant, Will, Oscar, and others coming onto the property that Singleton associated with defendant.

The three-day notice did not state the threats, harassment, and intimidation were based on domestic violence, and portions of the notice appeared to relate to harassment and intimidation by "threatening gang violence type retaliation if the other tenants make any complaints about them." Yet, the notice broadly provided the nuisance was based on defendant having "engaged in repeated hostile threats towards the other tenants in the building, including, *but not limited to*, blocking the parking access and spaces of the other tenants in the building, and damaging the vehicles of the other tenants in the building," and plaintiff presented evidence of several instances involving Singleton getting "dirty looks" and being threatened, harassed and intimidated for reasons unrelated to parking disputes.

Evidence was presented that Singleton felt threatened and intimidated by defendant repeatedly having been victimized by Oscar in and around the next-door apartment where defendant lived. Plaintiff brought forth such evidence when Singleton testified on direct examination that, what led to the day that defendant and Oscar drove a car close to her and gave her "stares and dirty looks," was when on the previous night, "Oscar and [defendant] were having this fight, and it was so bad that I could hear everything, because it was in the walkway where the stairs are. Me and my mother, we were talking about it, and they didn't like us talking about it." Singleton also testified on direct to being afraid of defendant and defendant's guests, "because they're violent people. They cause a lot of problems," and because she has seen "so many fights outside . . . . with [defendant] and others fighting with other people in the driveway." Singleton indicated she texted Keyser, the property manager complaining Oscar was parking in her spot and that "[defendant] is back with her abuser."

22

Although an inference could be drawn that the "many fights" Singleton saw referred to fights defendant and other people had engaged in other than between Oscar and defendant, in context, it did not preclude an inference that Singleton believed defendant and Oscar caused problems because defendant was continually getting into fights and "scuffles" with Oscar. Further, it could reasonably be inferred from the testimony about Singleton telling management on April 26 and April 29 defendant was "*back* with her abuser," that Singleton had complained about defendant being abused by Oscar previous to these two dates. In reviewing the granting of a directed verdict, we are required to accept the reasonable inferences which can be drawn from the evidence that support the applicability of the defense. (See *Hauter v. Zogarts*, *supra*, 14 Cal.3d at p. 110.)

Plaintiff used evidence of domestic violence to show Singleton was in fear of Oscar.[18] Defense counsel went further, eliciting domestic violence evidence in cross-examining Singleton to try to show she was threatened and harassed by Oscar's acts of domestic violence committed on the property. The evidence supported the defense that, to the extent the three-day notice nuisance grounds were based on defendant and Oscar's loud and disruptive fights and other domestic violence incidents, the notice could not support the eviction under section 1161.3.

Singleton testified on cross-examination that, although she believed Oscar was a gang member, she did not see him commit any gang-related crime. Singleton's fear and the interference with the enjoyment of her property sharply escalated and "got bad" in the months of April and May, coinciding with when defendant broke up with Oscar, and defendant was continually victimized by Oscar's violent behavior at the apartment complex. Living very close to defendant's unit, Singleton could "overhear the violence that goes on," and she feared Oscar was a violent person, "based on the way he abuses [defendant]." She saw holes in the wall by defendant's apartment door caused by "Oscar and [defendant] when they get in a scuffle [*sic*]."

---

[18]Plaintiff argued in closing that the jury "heard directly from defendant about Oscar's violent conduct at the property"; Singleton's fear was "coupled with the violence that she has already seen from this person just across the hall"; and Singleton was terrified because Oscar was "violent on the property on numerous occasions to the defendant."

Additionally, defense counsel elicited two instances of domestic violence documented in Singleton's texts to Keyser, sent, respectively, on May 23 and June 17. (1) She provided Keyser with a video, which Singleton maintained showed "that [defendant] was hit by her abuser. He beat her in the stairway." The video was given to management as "evidence" that could be used to support the unlawful detainer action and "prove that . . . [defendant] is bringing problems to the property, a hazard to everyone who lives there." (2) She told Keyser that during a "scuffle" between Oscar and defendant, Oscar indicated he "was going to take [defendant's] gun or had her gun," and she heard a gun being fired.[19]

It was uncertain whether Singleton narrated domestic violence acts she saw prior to or after the three-day notice having been served. Singleton admitted she was "really bad with dates," and the court and defense counsel's questioning regarding when the incidents occurred did not clear up the issue.[20] To the extent the texts described domestic violence that occurred prior to service of the notice, the incidents Singleton described could be considered as evidence supporting the defense. As we view the evidence in the light most favorable to the party opposing the directed verdict (*O'Shea v. Lindenberg*, *supra*, 64 Cal.App.5th at p. 235), and it is a reasonable conclusion that is deducible from the evidence (*Hunt v. United Bank & Trust Co.*, *supra*, 210 Cal. at p. 117), we presume the violence that was narrated happened prior to the service.

---

[19]Singleton also testified that, in a June 11 text, she told Keyser "[defendant's] boyfriend Oscar ran over her oldest son," and she further indicated she did not know whether this incident happened before or after the time she shot the video of Oscar beating defendant. Since Oscar did not have a relationship with the son that qualifies as one listed under the domestic violence definition in Family Code section 6211, this incident did not qualify as "domestic violence" under section 1161.3, subdivision (a).

[20]The court asked Singleton whether she "filmed something" and sent it to Keyser "right after it happened," and she answered, "Yes." But, when counsel earlier asked whether she sent the video to Keyser, "during the incident? Right after the incident? Soon after?" Singleton responded, "After," appearing to rule out she sent it "right after." Singleton testified the gun incident happened after the police served defendant with a temporary restraining order that Singleton sought against defendant. However, she did not indicate when service occurred, and subsequent to defense counsel asking Singleton whether the court denied issuing a restraining order, the court struck as irrelevant the line of questioning of Singleton pertaining to the order.

Lastly, in addition to Singleton's testimony, defendant herself provided evidence as to domestic violence which supported Singleton being threatened and harassed. Defendant testified Oscar was violent against her starting in April, and she would, "call the cops every time he'll come." Five days prior to service of the three-day notice, on May 5, when she would not allow Oscar to enter late in the night, he kicked the door with enough force to break it open, and an officer came to the complex and filled out a report. Although she did not provide any details, defendant noted that, before the May 5 report, there were other incidents involving physical violence by Oscar towards her. As Singleton lived a mere five feet from defendant, it is reasonable to conclude she heard and/or saw police reporting to the complex and the repeated instances when defendant was victimized by Oscar, and that she was disturbed, threatened and harassed as a result thereof.

Given the evidence presented in the case, we cannot conclude the domestic violence defense was inapplicable to defend against plaintiff's charges. Since there was substantial evidence supporting the defense, the court erred in not allowing the jury to consider it.

## DISPOSITION

The judgment is reversed. Defendant to recover costs on appeal.

_____
Ricciardulli, J.

I concur.

_____
Richardson, J.

25

KUMAR, ACTING P.J., DISSENTING:

I respectfully dissent. The Legislature has forbidden a landlord from terminating a lease "based upon an act or acts against a tenant . . . that constitute domestic violence . . . ." (Code Civ. Proc., § 1161.3, subd. (a).) The defense is viable if (1) the domestic violence is documented by, for example, a restraining order or police report (Code Civ. Proc., § 1161.3, subd. (a)(1)(A)-(E)), and (2) the abuser "is not a tenant of the same dwelling unit as the tenant." (Code Civ. Proc., § 1161.3, subd. (a)(2)). Because the unlawful detainer was not "based upon" acts of domestic violence and the evidence did not support such a defense, Code of Civil Procedure section 1161.3 was inapplicable. The trial court properly granted a directed verdict on this issue and properly refused to instruct on the defense.

***Was the unlawful detainer "based upon" any act of domestic violence?***

No. The three-day notice is incorporated into the complaint and is the gravamen of the unlawful detainer action. The three-day notice alleged, pursuant to Code of Civil Procedure section 1161, subdivision (4), defendant and her husband must vacate the property because they were "committing waste upon the demised premises" or were engaged in activities amounting to a nuisance. It provided, "You have violated [the statute] as follows: [¶] Lessees have engaged in repeated hostile threats towards the other tenants in the building including, but not limited to, blocking the parking access and spaces of the other tenants in the building, and damaging the vehicles of other tenants in the building. Lessees constantly have a large number of invitees that loiter on the property who are actively using and selling narcotics on the premises. Lessees and their guests routinely harass and intimidate the other tenants in the building by threatening gang violence type retaliation if the other tenants make any complaints about them."

The purpose behind the three-day notice is to give the tenant the opportunity to determine whether to quit the property or contest the allegations. (*Lee v. Kotyluk* (2021) 59 Cal.App.5th 719, 731; see also *Delta Imports, Inc. v. Municipal Court of Los Angeles Judicial District* (1983) 146 Cal.App.3d 1033, 1036 [If the three-day notice fails to properly advise the tenant of the alleged breach, "the tenant cannot know whether to comply with the notice to quit

1

or remain in possession and contest the landlord's allegations"].) Defendant elected to remain in the residence and, once a complaint was filed, she filed an answer wherein she asserted multiple defenses. She did not argue in her answer that the nuisance described in the three-day notice was the product of any abuse she endured at the hands of Oscar.[1] This is for a good reason; the three-day notice made no reference to noise resulting from any altercation much less an act of domestic violence. Rather, it specifically targeted two categories of conduct: the manner in which defendant, her husband, and their guests treated "other tenants"; and the loitering and drug activities engaged in by invitees. There was no hint in any of the pleadings that the eviction had anything to do with domestic violence.

*Did the evidence change the landscape of the case to include the possibility of an eviction based upon an act of domestic violence?*

No. The direct examination of Christine Singleton tracked the factual allegations in the three-day notice. I need not repeat the facts summarized by the majority. Suffice it to say that Singleton's problems with her parking space (what she described as a "real nuisance" occurring "nearly . . . every day"), "emotionally exhausting" conversations asking people to move their cars, vandalism to her vehicle, "dirty looks" she received from defendant and her guests, and rampant narcotics activity[2] convincingly demonstrated a nuisance.[3]

---

[1] "In order to qualify for an exemption under [Code of Civil Procedure section 1161.3], the victim would need to present—most likely in his or her answer to the unlawful detainer—evidence that he or she is a victim of domestic violence." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 782 (2009-2010 Reg. Sess.) as amended June 10, 2010, p. 4.)

[2] Singleton explained the impact of the narcotics activity as follows: "The property is unsafe I – we – when me and my daughter and my mother, we go outside to just pick up the mail, throw out the trash – my daughter is not allowed to play outside. It's a really unsafe environment because of this happening."

[3] Singleton's fear of defendant and her guests was palpable: "I just – I don't want trouble with those people. I'm very scared of them. They are associated with gangsters, and it's just me, my daughter, and my mom. I'm even terrified to be here, because I don't know what will happen to us after this."

The overarching theme of the majority opinion is that certain evidence may have led the jury to believe the unlawful detainer was based on a nuisance created by the domestic violence endured by defendant. The majority writes "the [three-day] notice broadly provided the nuisance was based on defendant having 'engaged in repeated hostile threats towards the other tenants in the building, including, *but not limited to*, blocking the parking access and spaces of the other tenants in the building, and damaging the vehicles of the other tenants in the building[.]'" (Original italics.) The majority suggests the scope of the referenced language includes acts of domestic violence endured by defendant and, for that reason, evidence of defendant's abuse at the hands of Oscar established at least one possible basis for the unlawful detainer action—"[t]he evidence supported the defense that, to the extent the three-day notice nuisance grounds were based on defendant and Oscar's loud and disruptive fights and other domestic violence incidents, the notice could not support the eviction under [Code of Civil Procedure] section 1161.3." There are several problems with this reasoning.

First, the language referenced by the majority in the three-day notice is not associated with acts of domestic violence. Rather, it charges defendant and her husband with threatening *other tenants* and cites a nonexclusive list of examples. "[N]ot limited to" refers to acts of the indicated variety, not to acts of domestic violence. The bottom line is that the words the majority lift from the three-day notice do not allege Oscar threatened defendant or that he had engaged in any domestic altercations.

Second, the statutorily required documentation of Oscar's domestic violence was limited to the May 5, 2019 incident. But there is nothing in the record to indicate the May 5 incident formed the basis of the eviction. There was no evidence that Singleton observed the May 5 incident, complained about it, or was even home when it occurred. Indeed, the evidence was introduced by the defense through defendant's testimony to show that Oscar was not an invitee; rather, his visits were of his choosing. The May 5 event is not tied to any allegation in the three-day notice or even to any testimony that it constituted an eviction-supporting nuisance on the property.

3

I part ways with the majority's assertion that documentation is not necessary for each individual act of domestic violence. The plain language of the statute, against the backdrop of the legislative purpose for documentation, refutes the majority's position. The defense prohibiting a landlord from evicting a tenant based on "an act or acts" against the tenant of domestic violence is available only if "[t]he act or acts of domestic violence . . . *have been documented*." (Code Civ. Proc., § 1161.3, subd. (a)(1), italics added.) In other words, to be assertable as an affirmative defense, there are two prerequisites: (1) the termination of the tenancy must be based on "an act or acts" of domestic violence; and (2) the "act or acts" must be documented. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 782 (2009-2010 Reg. Sess.) as amended June 10, 2010, pp. 1-2 [The legislation "[p]rohibits a landlord from terminating a tenancy based upon an act or acts of domestic violence . . . against the tenant . . . , *if the act or acts can be appropriately documented . . . .*" (Italics added)]; Stats. 2010, ch. 626, § 4 ["This bill would . . . prohibit a landlord from terminating a tenancy or failing to renew a tenancy based upon an act of domestic violence . . . against a protected tenant, as defined, . . . *when that act is documented, as specified . . . .*" (Italics added)].) This interpretation is consistent with the Legislature's intent to prevent tenants from fabricating incidents of domestic violence in order to fortify the defense. (See Sen. Judiciary Com., Analysis of Assem. Bill No. 2413 (2017-2018 Reg. Sess.) June 4, 2018, p. 7.) There is no statutory language or legislative history standing for the proposition that the documentation of one isolated incident is sufficient to allow a tenant to argue other undocumented incidents support the defense.

Third, the majority's position does not hold water even if undocumented abuse, occurring prior to the service of the three-day notice, could be used to provide a foundation for the defense. The majority relies on a number of text messages sent by Singleton to the property manager. Only the April 26 and 29, 2019 text messages predate the service of the three-day notice. They consisted of photographs (taken on the date of the text messages) of Oscar's vehicle in Singleton's parking spot (a nuisance cited in the three-day notice). During her direct examination, Singleton was shown those text messages and asked questions about what they depicted. The majority rely on Singleton's reply to the following question: "And what were

4

you saying in those text messages about the parking . . ." Singleton's response was, "I was saying that [defendant] is back *with her abuser*." (Italics added.) The majority posits, from the italicized words, "it could be reasonably inferred . . . that Singleton had complained about defendant being abused by Oscar previous to these two dates." But, in context, Singleton was simply advising the property manager that Oscar (identified as the "abuser") was present at the complex and, consistent with prior conduct, was parking in a way that blocked access to her parking place; there is nothing in the record to suggest it was a reference to a prior complaint to the landlord that domestic violence created a nuisance.[4] While Singleton may have heard or seen Oscar and defendant fighting before issuance of the three-day notice, those undocumented acts were not a basis for the three-day notice; at most they could have served as evidence that Singleton was legitimately afraid when she encountered them in the apartment complex.[5]

*Conclusion*

In the synopsis of the bill that triggered the enactment of Code of Civil Procedure section 1161.3, the Assembly Committee on Judiciary wrote the following.

This . . . bill is premised on the fair and simple premise that a victim of domestic violence should not be evicted from a home based on the actions of a violent abuser. Unfortunately, according to the author, too often victims are evicted from their homes because of the "nuisance" created by

---

[4]"Q And what were you saying in those text messages about the parking . . . on April 29th?
"A I was saying that [defendant] is back with her abuser.
"Q And who do you mean by that?
"A Oscar.
"Q And what were you saying about the parking in that text message?
"A He's *still parking in the driveway*." (Italics added.)

[5]The following exchange occurred on redirect of Singleton:
"Q. Do you believe that Oscar is a violent person?
"A Yes.
"Q Based on what?
"A Based on the way he abuses [defendant]. . . . [¶] [¶] [¶]
"Q . . . Why do you think [defendant] is also violent?
"A Because she has fought other women outside of our property.
"Q Are you afraid of Oscar?
"A And [defendant], yes."

5

the noise, fighting, and police visits caused by the violent perpetrator.
(Assem. Com. on Judiciary, Analysis of Sen. Bill No. 782 (2009-2010 Reg. Sess.) as amended June 10, 2010, p. 1.)

This is not the case envisioned by the Legislature when it enacted Code of Civil Procedure section 1161.3.  The unlawful detainer was based on the manner in which defendant and her guests treated other tenants, and their involvement in narcotics activity.  Substantial evidence did not support a defense that the unlawful detainer was based on a documented act of domestic violence.  I would affirm the judgment.

_____
Kumar, Acting P. J.

APPELLATE DIVISION OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| NORA ELMASSIAN, | ) | No. BV 033271 |
| | ) | |
| Plaintiff and Respondent, | ) | Pomona Trial Court |
| | ) | |
| v. | ) | No. 19STUD04792 |
| | ) | |
| NOEMI FLORES, | ) | |
| | ) | |
| Defendant and Appellant. | ) | **ORDER** |
| | ) | |

The court has considered defendant's request to modify the August 11, 2021 opinion. The opinion is modified as follows:

Page 12, footnote 10, the second sentence in the footnote that reads, "As there was no evidence his return caused Singleton to be threatened, harassed or intimidated, even if Will violated the order, this did not constitute domestic violence supporting the defense to the nuisance-based eviction," is deleted, and the following text is added: "As there was no evidence his return caused Singleton to be threatened, harassed or intimidated, even if Will violated the order, this domestic violence did not support the defense to the nuisance-based eviction."

Page, 24, footnote 19, the second sentence in the footnote that reads, "Since Oscar did not have a relationship with the son that qualifies as one listed under the domestic violence definition in Family Code section 6211, this incident did not qualify as "domestic violence" under section 1161.3, subdivision (a)."

1

The modifications do not change the judgment.


_____                    _____

Ricciardulli, J.                                                    Richardson, J.



Because I filed a dissent, I take no position on whether the ordered modification to the majority opinion is appropriate.  There are no modifications to the dissent.


_____

Kumar, Acting P. J.

2